**Russell McNEILLY, Plaintiff–Appellee,**

**v.**

**BANKERS UNITED LIFE ASSURANCE COMPANY, Defendant–Appellant.**

No. 92–2138.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 25, 1993.

Decided July 30, 1993.

**1200**

George Pietrzyk (argued), Park Ridge, IL, for plaintiff-appellee.

Louis C. Roberts, Daniel J. McMahon (argued), Peterson & Ross, Chicago, IL, for defendant-appellant.

Before CUMMINGS and ROVNER, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

ILANA DIAMOND ROVNER, Circuit Judge.

Russell McNeilly has sued Bankers United Life Assurance Company ("Bankers") under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1461, to recover health insurance benefits under an employee welfare benefit plan. The district court granted McNeilly's motion for summary judgment and Bankers appeals. We affirm.

## I. BACKGROUND

McNeilly is the sole proprietor of Russell McNeilly Studios (the "Studio"), which produces slide presentations for business use. Together with his wife, McNeilly also owns a duplex apartment building, which houses the Studio and one rental apartment. While cleaning the gutters of the duplex one Saturday, McNeilly fell from a ladder and broke his ankle. As a result, he was hospitalized for two weeks and incurred medical bills totaling $19,096.41.

The Studio participates in a group health insurance plan through the Comprehensive Hospital Medical Protection ("CHAMP") Trust. McNeilly and his one employee are insured through the CHAMP Trust Plan under a policy issued by Bankers. SJA Brokerage Inc. ("SJA") administers the CHAMP Trust Plan.

SJA denied McNeilly's claim for the expenses stemming from the fall, citing a clause in the Plan that excludes from coverage "any expenses caused by, incurred for, or resulting from . . . bodily injury or sickness which arises out of or in the course of any employment for wage or profit." [1] McNeilly appealed that decision directly to Bankers, which agreed with SJA that the expenses related to McNeilly's fall were excludable.

McNeilly then filed a breach of contract action against Bankers in state court. Bankers removed the suit to federal court, asserting that because the action involved an employee welfare benefit plan,[2] McNeilly's state law cause of action was preempted and his exclusive remedy lay under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B).[3] See 29 U.S.C. § 1144(a);[4] *Pilot Life Ins. Co.*

---

1. The clause also excludes from coverage "bodily injury or sickness for which the employee has or had a right to compensation under any Worker's Compensation or occupational disease law." The parties agree that McNeilly had no such right to compensation.

2. The district court subsequently found that because the health insurance plan covered both McNeilly and another Studio employee, it was an "employee benefit plan" as defined in 29 C.F.R. § 2510.3–3. (R. 58.)

3. Section 1132(a) provides:
 **(a) Persons empowered to bring a civil action**
 A civil action may be brought—

 (1) by a participant or beneficiary—
 \* \* \* \* \* \*
 (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan . . .

4. Section 1144(a) provides:
 Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title. . . .

*v. Dedeaux,* 481 U.S. 41, 47–57, 107 S.Ct. 1549, 1552–58, 95 L.Ed.2d 39 (1987) (Section 1132(a) is exclusive and preempts state law causes of action).

The district court subsequently granted McNeilly's motion for summary judgment and denied Bankers' cross motion, after determining that the exclusionary language did not apply to maintenance work on McNeilly's rental property. The court reasoned that the maintenance work was not related to McNeilly's employment at the Studio, but was instead one of his duties as a landlord. Because McNeilly was not *employed* as a landlord, however, the court concluded that the clause did not apply to activities McNeilly performed in that capacity. On appeal, Bankers does not contest the district court's finding that cleaning the gutter was not a part of McNeilly's employment at the Studio, but nonetheless maintains that maintenance work on rental property is "employment" for purposes of the Plan's exclusionary clause.

## II. DISCUSSION

 In section 1132(a)(1)(B) actions challenging denials of benefits, courts review the decisions of plan administrators de novo, except when the plan gives the administrator discretion to interpret plan terms or otherwise to determine benefits eligibility. *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989); *Phillips v. Lincoln Nat. Life Ins. Co.,* 978 F.2d 302, 307 (7th Cir.1992); *Hammond v. Fidelity and Guar. Life Ins. Co.,* 965 F.2d 428, 429 (7th Cir.1992). Because the CHAMP Trust Plan does not give SJA such discretion, the district court's de novo review was appropriate. We in turn review de novo the district court's grant of summary judgment. *Phillips,* 978 F.2d at 307.

 In construing insurance plans governed by ERISA, we are guided by the federal common law rules of contract interpretation. *Id.; Hammond,* 965 F.2d at 430. Two such rules are relevant here. First, "we interpret the terms of the policy 'in an ordinary and popular sense as would a [person] of average intelligence and experience.'" *Hammond,* 965 F.2d at 430 (quoting *Evans v. Safeco Life Ins. Co.,* 916 F.2d 1437, 1441 (9th Cir.1990)); *see also Phillips,* 978 F.2d at 308, 312–14. Second, when plan terms are ambiguous, we construe them strictly in favor of the insured. *Phillips,* 978 F.2d at 308, 311–14; *Hammond,* 965 F.2d at 430. The latter rule applies when, as here, there is no evidence that the parties negotiated the terms of the plan and we can assume that the insurer simply drafted the plan without input from the insured.[5] *Phillips,* 978 F.2d at 314. As we explained in *Phillips:*

> "[I]nsurance policy exceptions to liability must be expressed in unequivocal language so that it is reasonable to assume the insured understood and accepted these limitations." ... [A] plan participant cannot be denied benefits under a limitation which is ambiguous as to its application to his benefit claim.

*Id.* at 313 (quoting *Heller v. Equitable Life Assurance Soc'y,* 833 F.2d 1253, 1256 (7th Cir.1987)). In other words, if an exception does not unambiguously encompass a particular set of facts, it cannot be invoked to deny coverage in that instance.[6]

 Contract language is ambiguous if it is subject to more than one reasonable interpretation. *Auto–Owners (Mut.) Ins. Co. v. L.P. Cavett Co.,* 882 F.2d 1111, 1113 (7th Cir.1989); 2 E. Allan Farnsworth, *Farns-*

---

5. Bankers argues that resolving ambiguities in favor of the insured contradicts the rule set out in *Firestone,* 489 U.S. at 112, 109 S.Ct. at 955, that courts should not rely on either party's interpretation of plan language to ascertain its meaning. As we explained in *Phillips,* 978 F.2d at 311–12, however, relying on presumptions that favor one party is not the same as adopting that party's interpretation of disputed language.

6. Of course, "we will not 'artificially create ambiguity where none exists,'" *Hammond,* 965 F.2d at 430 (quoting *Evans,* 916 F.2d at 1441), or

disregard exclusions "upon every remotely colorable claim of plan ambiguity." *Phillips,* 978 F.2d at 313. Instead, "the rule that ambiguities must be resolved against insurers can only be invoked when there exists a 'genuine (meaning, substantial) uncertainty, not resolvable by other means, and the insured's proposed reading must be reasonable.... Rules of interpretation are tie-breakers, even when the words being interpreted appear in insurance policies.'" *Id.* (citation omitted).

*worth on Contracts* § 7.12a, at 280 (1990). Thus, if the term "employment" might reasonably be understood not to include McNeilly's maintenance activity, then its application to that activity is ambiguous at the very least, and we must interpret the clause in McNeilly's favor. Only if no reasonable interpretation of "employment" might exclude McNeilly's gutter cleaning would we apply the clause and uphold Bankers' denial of benefits.[7]

Interpretations of "employment" that exclude maintenance work on rental property are not difficult to find. The federal statutes that govern internal revenue and social security, for example, do not consider a landlord's activities to be "employment." Thus, income and deductions related to real estate rentals are not considered in calculating self-employment income for purposes of either taxation or eligibility for retirement benefits. *See* 26 U.S.C. § 1402(a); 42 U.S.C. § 411(a);[8] 26 C.F.R. § 1.1402(a)–4; *Hopper v. Comm'r of Internal Revenue*, 94 T.C. 542, 1990 WL 32773 (1990). Indeed, in the social security context, courts have expressly held that activity related to the ordinary management and upkeep of rental property is not "employment." In *Hollohan v. Heckler*, 805 F.2d 143 (6th Cir.1986), for example, a claimant argued as Bankers does here that savings she realized by cleaning and maintaining rental property herself rather than paying someone else to do so should be considered self-employment income in determining her eligibility for retirement benefits. The court rejected that argument, holding that the performance of janitorial duties did not convert real estate rentals into self-employment income. *Id.* at 145–46; *see also Delno v. Celebrezze*, 347 F.2d 159, 163–65 (9th Cir.1965); *Maloney v. Celebrezze*, 337 F.2d 231, 233 (3d Cir.1964); *Vogel v. Sullivan*, 735 F.Supp. 1353, 1359–60 (N.D.Ill.1990). Although these interpretations are of course not binding here, the fact that McNeilly's gutter cleaning would not be considered "employment" in either the internal revenue or social security contexts establishes at a minimum that the term does not unambiguously encompass such activity. Because application of the term "employment" to McNeilly's activity is therefore ambiguous, we must interpret the exclusionary clause in McNeilly's favor.

Bankers also argues that because the exclusionary clause refers to "employment for wage *or* profit," "employment for profit" must have a meaning distinct from that of "employment for wage." That meaning, Bankers contends, includes the maintenance of rental property because McNeilly profits

---

7. In *Senkier v. Hartford Life & Accident Ins. Co.*, 948 F.2d 1050 (7th Cir.1991), we approached a similar problem somewhat differently. There we explained:

> The insured ought to know what he is getting in his insurance policy, so that he can decide whether he would like more coverage at a higher price or less at a lower price. A lay person has a clear if inarticulate understanding of the difference between an accidental death and a death from illness, and that understanding will not be altered or improved by head-spinning judicial efforts at definition, such as the mysterious attempt by a court in this state to define disease as that which "originates from a source that is neither traumatic nor physical." A person can tell time without being able to define "time" and he can know how to ride a bicycle or shoot pool without being able to explain the principles of physics that enable him to do these things. He can also classify a death as the consequence of illness or accident without being able to define either term.

*Id.* at 1053 (citation omitted). Here, we similarly need not belabor the precise meaning of "em-

ployment," so long as we can be clear that, given its "ordinary and popular" meaning, the term does not unambiguously include McNeilly's activity.

8. 26 U.S.C. § 1402(a) provides:

> **Net earnings from self-employment.**—The term "net earnings from self-employment" means the gross income derived by an individual from any trade or business carried on by such individual, less the deductions allowed by this subtitle which are attributable to such trade or business . . .
> (1) there shall be excluded rentals from real estate and from personal property leased with the real estate . . . together with the deductions attributable thereto, unless such rentals are received in the course of a trade or business as a real estate dealer; . . .

42 U.S.C. § 411(a) relates to social security retirement benefits and tracks the section 1402(a) language. Interestingly, the two sections explicitly reject the notion that ownership of rental property is a "business," as Bankers has argued here.

from such activity.[9] But the mere fact that an activity results in a profit does not necessarily bring the activity within the ordinary meaning of "employment." Clearly, "employment for profit" does not include all potentially profitable activity. If that were so, simple home improvements would be "employment," so long as the improvement increases the value of the home and ultimately "profits" the owner. Even ordinary household chores would be "employment for profit" under Bankers' reasoning, as one "profits" by not hiring an employee to do that work. No such contortion of "employment" is necessary, however, for "profit" and "wage" to have distinct meanings. Profit and wage are simply alternative forms of compensation, both of which might be derived from "employment." The fact that "profit" may more commonly be associated with self-employment does not obliterate "employment" as a meaningful concept. We therefore need not stretch the plain meaning of the term "employment" for "wage" and "profit" to retain their ordinary and distinct meanings.

## III. CONCLUSION

"Employment for wage or profit" does not unambiguously include the maintenance work that McNeilly was performing at the time of his fall. That being so, the exclusionary language does not apply here, and Bankers must cover McNeilly's medical expenses in accordance with the terms of the insurance contract. The judgment of the district court is affirmed.

9. Bankers reasons:
These maintenance duties were an integral part of his duties in his business as a landlord.... The benefit Plaintiff received by performing these duties himself was that he incurred a business savings by not needing to retain another employee on the payroll to perform the maintenance duties. Clearly, this served to "profit" Plaintiff's business. (Bankers Brief at 14.)