John A. BALTHIS, Plaintiff,

v.

AIG LIFE INSURANCE COMPANY,
Defendant.

No. 1:99CV00135.

United States District Court,
W.D. Virginia,
Abingdon Division.

July 11, 2000.

James Victor Bates, Bowie & Bates, Bristol, VA, for plaintiff.

William Bradford Stallard, Penn, Stuart & Eskridge, Abingdon, VA, for defendant.

## OPINION

JONES, District Judge

In this ERISA case, I uphold the exclusion from coverage under a group accident insurance policy of a death caused in part by intoxication, even though I determine that my review is under a de novo standard.

## I

Gordon M. Balthis was employed as a truck driver. He was enrolled through his employer in a group accident insurance policy issued by the defendant, AIG Life Insurance Company ("AIG"). Under the policy, he was insured against accidental death in the amount of $150,000. Gordon Balthis designated his brother, John Balthis, as his beneficiary.[1]

The policy contains several exclusions from coverage and explicitly states that it does not cover "any loss caused in whole or in part by, or resulting in whole or in part from ... the Insured Person being legally intoxicated under the applicable law of the jurisdiction where the accident occurred...." (R. at 21.)

On the afternoon of December 27, 1997, Gordon was at his home in Beaufort, North Carolina. After drinking and a meal, he went to sleep on a couch. A friend who was present at the time indicated that some time later, Gordon made a snorting or choking sound, which the friend at first took to be snoring. A few minutes later, the friend discovered that Gordon was not breathing. He was taken to a hospital and was pronounced dead. The cause of death listed on the autopsy report was "acute ethanol intoxication with aspiration of gastric contents." (R. at 68.) Gordon's blood alcohol concentration at the time of the autopsy was 160 milligrams per deciliter. (R. at 73.)

John Balthis, the deceased's brother and beneficiary and the plaintiff in this case, filed a timely claim with the defendant, AIG. The claim was denied initially and

upon two appeals. The reason stated for the denial was that because the insured's death was caused by being intoxicated, it was not covered by the policy.

On September 13, 1999, the plaintiff filed the present action in this court, alleging that the denial of benefits constituted a breach of contract, and asserting jurisdiction based on diversity of citizenship and amount in controversy. *See* 28 U.S.C.A. § 1332(a) (West 1993 & Supp.1999). On March 22, 2000, he filed an amended complaint, asserting that his cause of action arose under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C.A. §§ 1001–1461 (West 1999 & Supp.2000).

Both parties have moved for summary judgment, and both have submitted additional affidavits they wish the court to consider in addition to the administrative record developed by the insurance company.[2] The issues have been briefed and argued, and the case is ripe for review.

## II

■ A denial of benefits under ERISA is to be reviewed de novo, unless the benefit plan gives the administrator discretionary authority, in which case an abuse of discretion standard is to be applied. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989).

■ The defendant argues that the policy language "due written proof" confers discretionary authority on the plan administrator and that therefore a deferential standard of review should be applied. The

---

1. For the sake of clarity, Gordon Balthis, the decedent, will be referred to by his first name.

2. The plaintiff has submitted affidavits from Edward Dennis, the decedent's roommate, and J.L. Almeida, M.D., the pathologist who performed the autopsy. Dennis' affidavit asserts that the decedent appeared to be functioning normally and exhibiting no signs of intoxication prior to his death. It also recounts the events leading up to Dennis' discovery that Gordon was not breathing. Almeida's affidavit indicates that he did not

determine whether Gordon was "legally intoxicated," that alcohol poisoning was not a factor in his death, and that sometimes healthy, sober adults choke in the absence of alcohol. The affidavit reiterates Almeida's opinion that alcohol was a factor in Gordon's death. The defendant has submitted an affidavit from Richard J. McGarry, a toxicology consultant and pharmacist, who attests that Gordon's blood alcohol level would have affected his mental and physical functioning.

standard rules of contract construction dictate that where unambiguous, the court will look to the plain meaning of the terms and that any ambiguities will be construed against the drafter.[3]

The pertinent sections of the policy are as follows:

Proof of Loss. Written proof of loss must be furnished to the Company within 90 days after the date of the loss. If the loss is one for which this Policy requires continuing eligibility for periodic benefit payments, subsequent written proofs of eligibility must be furnished at such intervals as the Company may reasonably require.

. . . . .

Payment of Claims. Upon receipt of due written proof of death, payment . . . will be made to the Insured Person's beneficiary. . . .

. . . . .

Time of Payment of Claims. Benefits payable under this Policy for any loss for which this Policy provides any periodic payment will be paid immediately upon the Company's receipt of *due written proof of the loss.*

(R. at 22 (emphasis added).)

In interpreting the meaning of "due written proof," the phrase's context is significant. It is informative that the references to "due proof" are contained in the sections of the policy that explain when claims will be paid and not in the section that delineates how a claim is to be submitted. *See McBride v. Continental Cas. Co.,* No. Civ. A. 97–4625, 1999 WL 301811, at *4 (E.D.Pa. May 11, 1999) (unpublished). The proof of loss section provides

the manner in which proof must be furnished (in writing, within a certain time limit). Although this section would be the logical place for language indicating discretion to evaluate the sufficiency of proof, this section does not contain the word "due." The subsequent sections that refer to "due written proof" indicate to whom and when claims will be paid. A reasonable interpretation of "due written proof" is that it means "written proof as provided in the proof of loss section." As such, it seems clear that "due" connotes a procedural requirement rather than a substantive review of the claim.

The plain meaning of "due" outside the context of the policy supports this reading. The dictionary defines "due" in this context as according to accepted procedures or required in the prescribed course of events. *See* Webster's Collegiate Dictionary 357 (10th ed.1996).

As contained in the policy, the language is categorical rather than conditional, and it is the type of language that would be expected in any insurance policy. If the defendant's contentions were correct, almost every denial of benefits from an ERISA-controlled policy would be subjected to deferential review. If the parties had wished to confer discretion on the insurance company, the group policy could easily have included explicit language to that end.

Another judge in this district has held that the phrase "upon due proof" was insufficient to warrant an abuse of discretion standard of review. *See Ayers v. Continental Cas. Co.,* 955 F.Supp. 50, 53 (W.D.Va.1996) (Kiser, J.). Courts in other circuits have reached similar conclusions.[4]

---

3. When interpreting insurance policies governed by ERISA, courts are to be guided by federal common law rules of construction. *See McNeilly v. Bankers United Life Assurance Co.,* 999 F.2d 1199, 1201 (7th Cir.1993). Under these principles, courts should apply the plain meaning of terms and construe ambiguities against the policy's drafter. *See id.*

4. The Fourth Circuit has not yet addressed this issue, though two unpublished opinions have determined that the phrase "satisfactory proof" does confer discretion on the plan administrator. *See O'Bryhim v. Reliance Standard Life Ins. Co.,* No. 98–1472, 1999 WL 617891, at *5 (4th Cir. Aug.16, 1999) (unpublished); *Wilcox v. Reliance Standard Life Ins. Co.,* No. 98–1036, 1999 WL 170411, at *2 (4th Cir. Mar.23, 1999) (unpublished); *see also*

See *Brown v. Seitz Foods Inc. Disability Benefit Plan,* 140 F.3d 1198, 1200 (8th Cir.1998); *Pascarella v. Continental Cas. Co.,* No. 97 CV 4428, 1999 WL 294724, *3 (E.D.N.Y. March 16, 1999) (unpublished); *McBride,* 1999 WL 301811, at *4. *But see Patterson v. Caterpillar, Inc.,* 70 F.3d 503, 505 (7th. Cir.1995); *Bollenbacher v. Helena Chem. Co.,* 926 F.Supp. 781, 787 (N.D.Ind.1996).

▮ I hold that the plain meaning of the plan is that "due written proof" is objective rather than subjective language, referring to a procedural rather than evaluative requirement. Even if the meaning of "due written proof" were ambiguous, however, I would be obligated to construe the phrase against the defendant. Therefore, I conclude that a de novo standard of review is appropriate.

### III

▮ Both parties have submitted affidavits to supplement the administrative record. Fourth Circuit case law provides that a court reviewing an ERISA claim de novo may, in its discretion, consider evidence that was not before the plan administrator. *See Quesinberry v. Life Ins. Co. of N. Am.,* 987 F.2d 1017, 1025 (4th Cir.1993). A district court should exercise such discretion, however, only when circumstances establish that the additional evidence is necessary to conduct a sufficient review of the administrator's decision. *See id.*

In this case, the additional materials are not necessary for an adequate review of the benefits denial. The affidavits do not significantly alter the facts of the case and do not change the interpretation of the policy's language. For these reasons, it is not necessary for me to consider the supplemental affidavits.

Considering the administrative record and evaluating the decision to deny benefits de novo, the remaining question is whether the policy excludes benefits under the circumstances of Gordon's death.

The primary function of the court in this instance is to ascertain the intention of the parties as shown by the language used in the insurance policy. If possible, the interpretation that gives effect to the apparent purpose of the parties will govern. *See* 11 Richard A. Lord, *Williston on Contracts* § 32:9, at 440 (4th ed.1999).

The policy excludes "any loss caused in whole or in part by, or resulting in whole or in part from ... the Insured Person being legally intoxicated under the applicable law of the jurisdiction where the accident occurred." (R. at 21.) The critical phrase in the policy is "legally intoxicated." The defendant argues that this means an alcohol concentration greater than 0.08, which is the legal limit for operating a motor vehicle under North Carolina law. *See* N.C. Gen.Stat. § 20–138.1 (1999).[5] Thus, the defendant asserts, the plaintiff's claim was properly denied because Gordon's alcohol concentration was 0.16. In contrast, the plaintiff argues that the phrase really means "illegally intoxicated," and that the claim could only be denied if the decedent had been intoxicated under circumstances that made it illegal for him to be in such a condition. Under this analysis, the plaintiff contends, the claim was improperly denied because it

---

*Nessell v. Crown Life Ins. Co.,* 92 F.Supp.2d 523, 530 (E.D.Va.2000) (adopting reasoning of Fourth Circuit cases). These decisions are not binding upon this court, but even if they were, the policy language at issue here is narrower than the terms at issue in those cases. "Satisfactory proof" may inherently imply discretion in a way that "due proof" does not. Black's Law Dictionary indicates that "due proof" would be proof sufficient to establish a prima facie claim, whereas "satis-

factory" indicates that a reasonable person would find the proof adequate. *See* Black's Law Dictionary 501, 1342 (6th ed.1990).

5. Under North Carolina law, the term "alcohol concentration" is expressed as grams of alcohol per 100 milliliters of blood. *See* N.C. Gen. Stat. § 20–4.01(1b) (1999). Gordon's blood alcohol concentration as shown by the toxicology report in the record translates to 0.16 under this statutory expression.

was not illegal for Gordon to become intoxicated in his own home. Looking to the plain meaning of the policy, I find that neither of these arguments is correct.

■ The plain meaning of the policy is that it excludes accidents resulting from intoxication. "Legally intoxicated" is clearly meant to apply when an accident occurred under circumstances for which the applicable state law proscribes a legal definition for intoxication, such as the alcohol concentration limit for driving, flying, or operating a motor boat. *See, e.g.,* N.C. Gen.Stat. §§ 20–138.1, 63–27, 75A–10 (1999). If one of these activities were involved, the particular legal alcohol limit would apply. The term "legally intoxicated" thus allows a presumption of intoxication without actual proof of intoxication, in accord with the North Carolina statutes. But because the decedent here was not involved in such a described activity, no such presumption is applicable. If the parties had intended for the statutory alcohol concentration limit for driving to control in all situations, such language could have been included in the policy. In the absence of this specific language, it is clear that a more general notion of intoxication is contemplated by the policy.

This does not mean, however, that benefits must be awarded if there is no law delineating specific alcohol concentrations or otherwise defining intoxication for the particular activity involved in the accident.[6]

Rather, the word "legally" becomes superfluous, and the plain meaning is that claims based on accidents caused in whole or in part by intoxication are excluded. To hold that the phrase "legally intoxicated" in fact means "illegally intoxicated" or even "intoxicated under circumstances that make such intoxication illegal" would strain the plain meaning of the policy terms.

The plaintiff's interpretation of the phrase is further contrary to any expected purpose behind the exclusion. Under the plaintiff's theory, if an insured, while drunk, stepped in front of a passing automobile on the street and was killed or injured, the loss would not be covered, since the insured was guilty of public intoxication, *see* N.C. Gen.Stat. § 14–444(a)(1) (1999). On the other hand, if the insured stepped in front of a car in his own driveway while intoxicated, the loss, since not in a public place, would be fully covered. Since it is probable that the intended purpose of the exclusion is to prevent recovery where the loss was occasioned by intoxication, a condition normally within the voluntary control of the insured, the plaintiff's interpretation is not in accord with that purpose.[7]

The remaining inquiry is whether Gordon was intoxicated at the time of his death and whether his intoxication was a cause of the accident. The autopsy report listed "acute ethanol intoxication" as a

**6.** North Carolina law otherwise defines intoxication as "drunkenness, stupefaction, depression, giddiness, paralysis, irrational behavior, or other change, distortion, or disturbance of the auditory, visual, or mental processes," N.C. Gen.Stat. § 90–113.9(1) (1999), and as "the condition of an individual whose mental or physical functioning is presently substantially impaired as a result of the use of alcohol or other substance," N.C. Gen.Stat. § 122C–3(18) (1999), but these definitions are limited, respectively, to the North Carolina Toxic Vapors Act and the Mental Health, Developmental Disabilities, and Substance Abuse Act of 1985. *See id.* Neither of these statutes speak specifically to Gordon's conduct at the time of his death, although they do define intoxication in its commonly understood way.

**7.** The policy also excludes any loss caused by "... the Insured Person's voluntary use of any controlled substance as defined in Title II of the Comprehensive Drug Abuse Prevention and Control Act of 1970, as now or hereafter amended, unless as prescribed by [a physician]." (R. at 21.) The plaintiff argues that this exclusion for illegal drug use reinforces his notion that only illegal intoxication causing loss is precluded by the insurance policy. However, the other exclusions in the policy have no relation to illegal activity, but like intoxication or illegal drug use, involve activities that increase the risk of loss, e.g., service as member of the armed forces, learning to fly. (R. at 21.)

cause of death, and this expert medical opinion has not been effectively impeached by any other evidence in the record. It is clear that Gordon was intoxicated at the time of his death and that his intoxication was a contributing cause of his death.

Because the decedent's death was caused at least in part by intoxication, it is explicitly excluded by the policy. Therefore, the insurance company's denial of the plaintiff's claim was not in error.[8]

### IV

For the foregoing reasons, the defendant's motion for summary judgment will be granted and final judgment entered for the defendant.

---

8. In view of my decision, I need not reach the defendant's alternate argument that the insured's death was not "accidental" within the meaning of the insurance policy.